In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-21-00140-CR**
_____

**JIMMY WAYNE CARTER, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 128th District Court**
**Orange County, Texas**
**Trial Cause No. A180691-R**

**MEMORANDUM OPINION**

A grand jury indicted Appellant Jimmy Wayne Carter for continuous sexual abuse of a child, a first-degree felony. *See* Tex. Penal Code Ann. § 21.02(b). A jury found Carter guilty and assessed punishment at forty-five years' imprisonment. Carter appeals his conviction, raising three issues. For the reasons stated herein, we affirm the judgment as modified.

1

## Background

The indictment alleged that Carter:

…from on or about March 15, 2018 through June 20, 2018,[] when the defendant was 17 years of age or older, commit[ted] two or more acts of sexual abuse against a child younger than 14 years of age…

on or about March 15, 2018, in Orange County, Texas, did then and there intentionally and knowingly cause the penetration of the sexual organ of [Aurora[1]], a child who was [] younger than 14 years of age by his penis and

on or about April 20, 2018, in Orange County, Texas, did [] intentionally and knowingly cause the penetration of the anus of [Aurora], a child who was [] younger than 14 years of age by his penis and

on or about June 30, 2018, in Orange County, Texas, did [] intentionally and knowingly cause the penetration of the anus of [Aurora], a child who was [] younger than 14 years of age by his penis[.]

In his first trial, the jury was deadlocked, and the trial court declared a mistrial. In his second trial under the same indictment, the jury found him guilty as charged, and he now appeals his conviction.

## Evidence at Second Trial

### Testimony of Aurora

Aurora was nine years old when she testified at trial, and she identified Carter as the person she used to call daddy or Jimmy. She testified that the body part under

---

[1] We use pseudonyms to refer to the alleged victim—a minor child—her family members other than Carter, and a family friend. *See* Tex. Const. art. I, § 30(a)(1) (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal judicial process").

2

her pants was her "privates[]" and her "tee-tee[,]" and the part of the body she sits on is her "bottom." Aurora agreed that Carter did something bad to her, that he "sticked his wee-wee in [her] tee-tee[,]" he "slipped it to [her] bottom," and he did these things "a lot[]" and "[a] lot of times." She agreed that she had seen Carter's "wee-wee" when he "stuck [her] in the bathroom with him[]" and "told [her] to suck on his wee-wee." On direct examination, the following exchange occurred:

[Prosecutor]: Okay, Now, did he just do -- what he did to your tee-tee and bottom, did he do that just once or a lot of times?

[Aurora]: A lot of times.

[Prosecutor]: Okay. And you know what a month is, right?

[Aurora]: Uh-huh.

[Prosecutor]: Yeah. "Yes"?

[Aurora]: Yes.

[Prosecutor]: Uh-huh. And that's like February [is] your birth month, right?

[Aurora]: Uh-huh.

[Prosecutor]: Can you say "yes" for me?

[Aurora]: Yes.

[Prosecutor]: And did this happen over -- did this happen just one month, or did it happen a lot of months?

[Aurora]: Well, it was -- it was a lot.

[Prosecutor]: A lot of months.

3

On cross-examination, Aurora testified that when she was living with Carter and Addison (Carter's wife and Aurora's stepmother), there were six children, including herself. She recalled that the house was messy and "kind of dirty." Aurora testified that, at the time of trial, she was living with her grandparents in Louisiana. Aurora also testified that her other grandmother—Carter's mother—lived behind them. The following exchange occurred between Aurora and counsel for the defendant:

> [Defense counsel]: Do you remember ever telling your grandmother that if you said these things about Daddy Jimmy that you could go live with your other grandparents in Louisiana? Do you remember saying that to your grandmother?
>
> [Aurora]: Well, yeah, I think I said that.
>
> [Defense counsel]: You said that to your grandmother?
>
> [Aurora]: I think so.
>
> [Defense counsel]: Okay. So you told her that if you -- that if -- who told you to say those things?
>
> [Aurora]: Well -- well, Jimmy did.
>
> [Defense counsel]: Jimmy told you to say if he did those things to you that you could go live [] with your other grandparents, or did someone else tell you?
>
> [Aurora]: He didn't want me to go live with them. They just came here [] to take me from Jimmy, to bring me back home.
>
> [Defense counsel]: Did anybody tell you what to say here today?
>
> [Aurora]: Well, Jimmy told me not to tell anybody.

4

Aurora recalled talking with the prosecutor and other people before trial, but she testified that no one told her what to say except the prosecutor. On redirect, Aurora agreed that she and the prosecutor had practiced talking into the microphone before trial.

Testimony of the Sexual Assault Nurse Examiner

The SANE testified that she examined Aurora on October 11, 2018. She did not note any injuries to Aurora's genitals or anus, but she did note that Aurora's anus "dilated really quickly[,]" which the SANE stated "can be concerning." The SANE also testified that such dilation could be because Aurora needed to use the restroom, it could be caused by constipation, or it could be caused by or related to anal sexual abuse. According to the SANE, Aurora told her:

> "I'm going to tell you all about what my daddy did to my bottom. When he sticked his wee-wee in my bottom. When he was done, he told me not to tell no one." And she pointed to her genitals when she was describing her wee-wee and she pointed to her anus when describing her bottom. "I was in my daddy's room on his bed, and he took my panties off. He just took his pants off a little bit. He just do's it all the time. He does it to my tee-tee. It hurts. He tries to put it in my mouth. It makes me choke. It hurts. He tries to put his finger in my mouth, and then he put his finger in my tee-tee. Ugh, yuck. He did it when I was a baby, too. Sometimes he licks his finger and puts it in my bottom. He tells me not to tell no one. That's bad. He lays down with my brother [Brody]."

According to the SANE, based on the history she obtained, Aurora indicated that penetration of the mouth, vagina, and anus had occurred. The SANE testified that

5

Aurora told her the last time she had contact with Carter was the previous day. The SANE agreed that Aurora's statement came from Aurora and that there was no indication in her notes that a family member or other person was with Aurora during the exam. Aurora's medical records, including the SANE's report, were entered into evidence.

The SANE testified that whether there is physical trauma or injury to the genitals of a sexual assault victim depends on the time between the event and the exam, and "as soon as there's injury, the body begins to repair itself, especially in the genital area." The SANE further testified that, in her experience, it is rare to see an injury to a child's genital area. The SANE agreed that "no injury does not mean no abuse[.]"

Testimony of Officer Matthew Wappler

Officer Matthew Wappler testified that in October 2018, he was working for the Orange County Sheriff's Office as a detective, and he mainly worked crimes against children or sex-related crimes. Wappler agreed that he investigated the allegations against Carter, including speaking with Carter and collecting evidence for a SANE exam. Wappler agreed that on October 10, 2018, he was dispatched to an elementary school because Aurora had made an outcry of sexual assault and that Aurora's stepmother, Addison, gave him a statement. He also agreed that he arrested

Carter within a day or two. According to Wappler, Carter denied that he committed the alleged offense.

Wappler stated that no evidence resulted from the SANE exam, which Wappler testified was "very normal[,]" and the more time that has elapsed since the alleged offense, "it's more likely to have less evidence." Wappler testified that he did not believe there was an active crime scene when the allegations were made, he did not believe it was necessary to conduct an examination at the scene, and he did not go inside the trailer. According to Wappler, "[w]e had nothing to lead us to believe [the offense] had happened in the last 24 to 72 hours."

Testimony of Addison

During the State's case in chief, Addison testified that she and Carter "were together[]" for seven years, and in 2018, they had four children—Brylee, Brody, Karl, and Rianne—and Aurora and Daria also lived with them in a three-bedroom trailer. Addison testified that Aurora was Carter's child by Ellen, Daria was Carter's child by Brenda, and Ellen and Brenda had given Carter custody of Aurora and Daria.

Addison also testified that in 2018, she was suffering from depression, she was prescribed medication, but she "wasn't allowed" to take the medicine, and Carter would "take it and burn it." According to Addison, she felt overwhelmed, and the home was "a mess."

7

Addison agreed that Carter had a "high sex drive[,]" and that after having been pregnant three years in a row, she lost interest in sex. According to Addison, the only room with a door was the master bathroom. Addison testified that typically Carter would have what the children called "snuggle time" with the children, she felt a little relief because it gave her the opportunity to focus on other things in the home, and she did not feel the need to check on the children. Addison recalled that the children were with Carter "sometimes separately, sometimes together[,]" and sometimes just Aurora went into the room. Addison also recalled that sometimes she heard crying, but she "figured they were fighting or something." Addison testified that Carter's favorite children were Aurora and Daria, and he told her that Aurora and Daria "needed more attention because their moms weren't in the picture." Addison also testified that Aurora suffered from constipation, a doctor had prescribed medication for Aurora, and when Aurora said her belly hurt, Addison knew that Aurora needed the medication.

Addison agreed that in October 2018, she learned that Aurora made an outcry of sexual abuse, and she took her to the hospital where a SANE saw Aurora. Addison also agreed that she cooperated with law enforcement and CPS. According to Addison, Officer Wappler asked her to call Carter, and when she mentioned the allegations, Carter promised and swore he did not "do that" to his children, and he

threatened to harm himself. She testified that she broke off her relationship with Carter "[a] day or two after the allegations."

During the defense's case in chief, Addison testified that she knew Carter had fathered Aurora with Ellen and had fathered Daria with Brenda. She also testified that at one point, she and Carter moved into a trailer that was on land owned by Carter's mother, and his mother had a swimming pool the children used.

Testimony of Janine

Janine, Carter's mother, testified as a witness for the defense. Janine agreed that Carter had children with Addison, that he had Aurora with Ellen, and that he had Daria with Brenda. Janine testified that Ellen had "mental problems[,]" Brenda "was a drug addict[,]" and Carter took in Aurora and Daria because their mothers could not take care of them. Janine recalled that before Aurora went to live with Carter and Addison, Aurora lived with her grandparents in Louisiana. Janine agreed that Aurora did not live with Carter when she was a baby.

Janine testified that she had a house and land in Vidor and Carter and his family moved into a trailer that was behind her house. She agreed that she has a swimming pool that the grandchildren enjoy using.

According to Janine, all the doors in Addison and Carter's home were broken and had been hauled away, and the children would go to her house quite a bit. Janine agreed that it was hard to find a private place in the trailer.

9

Janine testified that she never saw Carter do anything inappropriate with Aurora, Aurora did not express any fear towards Carter, and Aurora was open and loving with Carter. Janine also testified that Addison did not treat Aurora and Daria well and "she would make them do the chores for the other kids[.]" Janine recalled a day when Aurora returned home after visiting her mother and maternal grandmother, and when her mother and grandmother left, Aurora said "There goes my best friend[.]" Janine testified that she told Aurora she would see them again, and Aurora replied, "Yeah, I will…[b]ecause they…said if I…say Daddy touched me here…I can go stay with them in Louisiana[,]" and Aurora grabbed her crotch as she spoke. According to Janine, she asked if her daddy did that, and when Aurora said, "No[,]" Janine told her not to lie because it was bad and people could get in trouble. On cross-examination, Janine stated that she knew her son did not do the offense alleged.

Testimony of Elizabeth Wolf

Elizabeth Wolf testified as an expert witness for the defense, and she stated she was a certified forensic nurse and Sexual Assault Nurse Examiner, and she trains nurses to become SANEs. She also agreed that she had reviewed Aurora's medical records that were admitted into evidence. She agreed the records showed no injury to Aurora's genitalia, and there was no physical evidence that Aurora had been molested. Wolf testified that the patient history portion of the report stated that the

10

patient had made an outcry or said there was sexual assault. Wolf agreed that the report noted "rapid anal dilation" with stool in the canal. According to Wolf, rapid anal dilation is a symptom of chronic constipation, but that stool in the canal was not consistent with chronic constipation.

On cross-examination, Wolf agreed there was no physical evidence that contradicted the patient's reported history. She also agreed that anal penetration during sexual abuse could cause the anus to dilate rapidly.

Testimony of Carly

Carly testified that her best friend was Addison's aunt and that she knew Carter. She agreed that she visited Addison and Carter at their trailer "all the time[]" when she lived in the area for about six months in 2019, including days and nights. According to Carly, there were no bedroom doors and only one bathroom door. She agreed that sometimes she would watch the children while Addison and Carter had private time. According to Carly, Aurora "lit up[]" around her father, was "very happy" to see him, and was more withdrawn with Addison. Carly also testified that Addison treated Aurora differently from her own children, she would make Aurora clean the house, and she treated her own children better than Aurora and Daria.

Carly recalled a day in 2018 when Addison had taken Aurora to where Carly was living, and Aurora's maternal grandmother called wanting to see Aurora. According to Carly, Addison "lied to Jimmy and snuck around and let [Aurora] go

11

with her grandmother that day[,]" and Carter was furious because Addison had lied and he wanted his daughter back. Carly agreed that shortly after this incident, the allegations against Carter came about and he was arrested. Carly also agreed that Addison had met another man on a dating website. Carly also testified that she met the man after Carter was arrested. According to Carly, she never noticed Aurora being fearful of Carter or Carter acting inappropriately toward Aurora.

Issues

In his first issue, Appellant argues that the evidence was insufficient to support a finding that the alleged abuse occurred during a span of at least thirty days. According to Appellant, "[t]he record and evidence presented at trial is at best vague relating to the timeline of the specific allegations" against him. Appellant argues that none of the trial evidence provided any details about when the alleged offenses occurred. Appellant also argues that the case should be remanded for a new trial on the underlying lesser-included offenses alleged in the indictment because the charge incorrectly instructed the jury that it did not need to unanimously agree on which specific acts of sexual abuse were committed or the exact date when the acts occurred.

In his second issue, Appellant argues that the jury charge failed to require the jury to unanimously find that two or more acts of sexual abuse occurred over a period of at least thirty days. Appellant concedes he did not object to the charge at trial, but

12

he argues that the error resulted in egregious harm requiring that we reverse and remand for a new trial.

In his third issue, Appellant argues that the trial court erred by assessing attorney's fees against him because there was no evidence that his indigency status had changed since the time the trial court appointed counsel for him because he was indigent.

## Sufficiency of the Evidence

A person commits the offense of continuous sexual abuse of a child if:

(1) during a period that is 30 or more days in duration, the person commits two or more acts of sexual abuse, regardless of whether the acts of sexual abuse are committed against one or more victims; and

(2) at the time of the commission of each of the acts of sexual abuse, the actor is 17 years of age or older and the victim is a child younger than 14 years of age, regardless of whether the actor knows the age of the victim at the time of the offense.

Act of May 26, 2017, 85th Leg., R.S., ch. 1038, § 2, 2017 Tex. Sess. Laws 4079, 4079 (current version at Tex. Penal Code Ann. § 21.02(b)). Section 21.02 of the Penal Code defines "act of sexual abuse" as including, among other things, an act that constitutes the offense of aggravated sexual assault. Tex. Penal Code Ann. § 21.02(c)(4). A person commits the offense of aggravated sexual assault of a child if the person intentionally or knowingly causes the penetration of the anus or sexual organ of a child by any means and the victim is younger than fourteen years of age. *Id.* § 22.021(a)(1)(B)(i), (a)(2)(B). The State need not prove the exact dates of the

13

abuse, only that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *Brown v. State*, 381 S.W.3d 565, 574 (Tex. App.—Eastland 2012, no pet.); *Lane v. State*, 357 S.W.3d 770, 773-74 (Tex. App.—Houston [14th Dist.] 2011, pet. ref'd); *see also* Tex. Penal Code Ann. § 21.02(d) ("[M]embers of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed.").

In reviewing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational factfinder could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007). We give deference to the factfinder's responsibility to fairly resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Hooper*, 214 S.W.3d at 13. If the record contains conflicting inferences, we must presume that the factfinder resolved such facts in favor of the verdict and defer to that resolution. *Brooks v. State*, 323 S.W.3d 893, 899 n.13 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). The jury as factfinder is the sole judge of the weight of the evidence and credibility of the witnesses, and it may believe all, some, or none of the testimony presented by the parties. *See Metcalf v. State*, 597 S.W.3d 847, 865

(Tex. Crim. App. 2020) (citing *Febus v. State*, 542 S.W.3d 568, 572 (Tex. Crim. App. 2018); *Heiselbetz v. State*, 906 S.W.2d 500, 504 (Tex. Crim. App. 1995)). The appellate court does not reweigh the evidence or determine the credibility of the evidence, nor does it substitute its own judgment for that of the factfinder. *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007).

"Direct and circumstantial evidence are treated equally: 'Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt.'" *Clayton*, 235 S.W.3d at 778 (quoting *Hooper*, 214 S.W.3d at 13). Each fact need not point directly and independently to the guilt of the defendant, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. *Temple v. State*, 390 S.W.3d 341, 359 (Tex. Crim. App. 2013); *Hooper*, 214 S.W.3d at 13; *Johnson v. State*, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993). The testimony of a child victim, standing alone and without corroboration, is sufficient to support a conviction for sexual assault of a child. *See* Tex. Code Crim. Proc. Ann. art. 38.07 (providing that a child's testimony alone is sufficient to support a conviction for sexual assault when either the victim informed someone other than the defendant within one year after the offense allegedly occurred or when the child is under the age of seventeen at the time of the alleged offense); *Garcia v. State*, 563 S.W.2d 925, 928 (Tex. Crim. App. 1978).

According to Appellant, the trial evidence did not provide any details about when the alleged offenses occurred. Appellant states that the SANE's testimony "contains no timeline." Appellant also states that Aurora's testimony did not provide a timeline. Appellant argues that the lack of evidence on when the alleged offenses occurred renders the evidence insufficient to support a finding that the abuse occurred over a span of at least thirty days.

In December 2018, the grand jury indicted Carter, alleging three instances of sexual penetration by Carter against Aurora occurring on or about March 15, April 20, and June 30, 2018. Addison, Officer Wappler, and the SANE testified that Aurora made an outcry of sexual abuse in October 2018. Aurora testified that Carter had put his "wee-wee" in her "tee-tee" and her "bottom," and he also told her "to suck on his wee-wee." When asked whether these things happened "just one month, or [] a lot of months[,]" Aurora replied that it "was a lot." Aurora was nine years old at the time of trial, and she agreed she knew what a "month" was. The SANE testified that Aurora told her that her daddy put his "wee-wee" in her bottom and in her "tee-tee[,]" he tried to put it in her mouth, and he put his finger in her bottom. The SANE also testified that Aurora told her he did these things "all the time[]" and when she was a baby. The SANE's report, which included what Aurora stated to her, was admitted into evidence.

16

The jury, in its role as factfinder, could have found Aurora and the SANE credible. The jury could have believed Aurora's testimony that she understood what a "month" was. The jury also could have believed that the alleged offenses occurred prior to the date of the indictment and that they happened "a lot[,]" and "all the time." Based on the evidence at trial, the jury could have concluded that "there were two or more acts of sexual abuse that occurred during a period that was thirty or more days in duration." *See Brown*, 381 S.W.3d at 574; *Lane*, 357 S.W.3d at 773-74; *see also* Tex. Penal Code Ann. § 21.02(d). Viewing the evidence in the light most favorable to the verdict and deferring to the jury's authority to determine the credibility of witnesses and the weight to give their testimony, we conclude that a reasonable factfinder could have found the essential elements of the offense beyond a reasonable doubt. *See* Tex. Code Crim. Proc. Ann. art. 38.07(a), (b)(1); *Metcalf*, 597 S.W.3d at 865; *Brooks*, 323 S.W.3d at 902 n.19; *Clayton*, 235 S.W.3d at 778; *Hooper*, 214 S.W.3d at 13; *Garcia*, 563 S.W.2d at 928. We overrule issue one.

Jury Charge

The defense did not object to the charge. Therefore, because Appellant failed to preserve error, we may not consider this ground for reversal unless the error is fundamental error, and the Appellant is entitled to a reversal only if the error created "egregious harm." *See* Tex. R. App. P. 33.1(a); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) ("[I]f no proper objection was made at trial and the

17

accused must claim that the error was 'fundamental,' he will obtain a reversal only if the error is so egregious and created such harm that he 'has not had a fair and impartial trial' -- in short 'egregious harm.'"); *Lyle v. State*, 418 S.W.3d 901, 905-06 (Tex. App.—Houston [14th Dist.] 2013, no pet.). Appellate review of purported error in a jury charge involves a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012) (citing *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994); *Middleton v. State*, 125 S.W.3d 450, 453 (Tex. Crim. App. 2003)). First, we determine whether the jury instruction is erroneous. *Kirsch* at 649. If there is no error, our analysis ends. *Id.* Second, if error occurred, an appellate court must then analyze that error for harm. *Id.*

Texas Code of Criminal Procedure article 36.14 directs a trial court to "deliver to the jury…a written charge distinctly setting forth the law applicable to the case[.]" Tex. Code Crim. Proc. Ann. art. 36.14; *see also Mendez v. State*, 545 S.W.3d 548, 551-52 (Tex. Crim. App. 2018); *Vasquez v. State*, 389 S.W.3d 361, 366 (Tex. Crim. App. 2012) (citing *Abdnor*, 871 S.W.2d at 731). "Because the charge is the instrument by which the jury convicts, [it] must contain an accurate statement of the law and must set out all the essential elements of the offense." *Dinkins v. State*, 894 S.W.2d 330, 339 (Tex. Crim. App. 1995). In examining the charge for possible error, reviewing courts "must examine the charge as a whole instead of a series of isolated and unrelated statements." *Id.*

18

To determine whether egregious harm resulted from an erroneous charge, we examine "the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole." *Almanza*, 686 S.W.2d at 171. Appellant must have suffered actual, rather than theoretical, harm. *Arline v. State*, 721 S.W.2d 348, 352 (Tex. Crim. App. 1986). Errors that result in egregious harm are those that affect the very basis of the case, deprive the defendant of a valuable right, or vitally affect a defensive theory. *See Hutch v. State*, 922 S.W.2d 166, 171 (Tex. Crim. App. 1996).

The statute under which Appellant was charged has a specific provision addressing unanimity:

> If a jury is the trier of fact, members of the jury are not required to agree unanimously on which specific acts of sexual abuse were committed by the defendant or the exact date when those acts were committed. The jury must agree unanimously that the defendant, during a period that is 30 or more days in duration, committed two or more acts of sexual abuse.

*See* Tex. Penal Code Ann. § 21.02(d).

The relevant portion of the jury charge in this case included the following:

> To prove that the defendant is guilty of Continuous Sexual Abuse of a Young Child, the state must prove, beyond a reasonable doubt, four elements. The elements are that --
>    1.  the defendant committed two or more acts of sexual abuse; and
>    2.  these acts of sexual abuse were committed during a period that is thirty or more days in duration; and

19

3. at the time of the commission of each of the acts of sexual abuse the defendant was seventeen years old or older; and

4. at the time of commission of each of the acts of sexual abuse the victim was a child younger than fourteen years old.

. . .

With regard to element 1, you need not all agree on the exact date when those acts were committed. You must, however, all agree that the defendant committed two or more acts of sexual abuse.

With regard to element 2, you must all agree that at least thirty days passed between the first and last acts of sexual abuse committed by the defendant.

Appellant argues that a jury charge for continuous sexual abuse of a minor must make it clear that "the first and last acts must occur thirty or more days apart[,]" citing *Jimenez v. State*, No. 07-13-00303-CR, 2015 Tex. App. LEXIS 10951, at **14-15 (Tex. App.—Amarillo Oct. 26, 2015, pet. ref'd) (mem. op., not designated for publication) and *Smith v. State*, 340 S.W.3d 41, 50 (Tex. App.—Houston [1st Dist.] 2011, no pet.). Appellant's argument lacks merit because the charge instructed the jury that "you must all agree that at least thirty days passed between the first and last acts of sexual abuse committed by the defendant." This instruction complies with section 21.02(d) of the Penal Code. *See id.* § 21.02(d); *see also Turner v. State*, 573 S.W.3d 455, 462-63 (Tex. App.—Amarillo 2019, no pet.) (explaining that a jury charge for continuous sexual abuse of a child must make it clear that the first and last acts alleged must occur thirty or more days apart); *Garner v. State*, 523 S.W.3d 266, 271 (Tex. App.—Dallas 2017, no pet.) (explaining that the State is required to show "that two or more acts of sexual abuse occurred during a period of thirty days

20

or more[]"); *Baez v. State*, 486 S.W.3d 592, 595 (Tex. App.—San Antonio 2015, pet. ref'd) (explaining that section 21.02(d) requires that the jury must unanimously agree that the defendant committed two or more acts of sexual abuse during a period that is thirty or more days in duration). Because we find no error in the jury charge, we need not determine whether egregious harm resulted. *See Kirsch*, 357 S.W.3d at 649. We also need not decide whether the case should be remanded for consideration of lesser-included offenses. *See* Tex. R. App. P. 47.1; *see also Arteaga v. State*, 521 S.W.3d 329, 340 (Tex. Crim. App. 2017) (characterizing reversal and remand for a new trial as the "normative remedy" where harmful jury charge error has been found); *Posey v. State*, 966 S.W.2d 57, 61 (Tex. Crim. App. 1998) ("*Almanza* does not apply unless the appellate court first finds 'error' in the jury charge."). We overrule Appellant's second issue.

## Attorney's Fees

In his third issue, Appellant argues that the trial court abused its discretion by assessing attorney's fees against an indigent defendant. The State agrees. The trial court determined that Carter was indigent but then assessed reimbursement fees of $15,430.44 even though there was no evidence before the court to show that Carter's indigency status had changed.

Absent a change in a defendant's status as an indigent, a trial court is not authorized to impose an award of attorney's fees in the judgment against a defendant

who remains indigent when the judgment is pronounced. *See* Tex. Code Crim. Proc. Ann. arts. 26.04(p), 26.05(g); *Wiley v. State*, 410 S.W.3d 313, 315, 317 (Tex. Crim. App. 2013); *Roberts v. State*, 327 S.W.3d 880, 884 (Tex. App.—Beaumont 2010, no pet.). Article 26.05(g) provides that a judge shall order a defendant to pay a reimbursement fee to offset in part or whole the cost of legal services provided to the defendant "[i]f the judge determines that a defendant has financial resources" to do so. *See* Tex. Code Crim. Proc. Ann. art. 26.05(g). The record does not demonstrate that the trial court found a material change in Carter's financial circumstances. We are authorized by the Texas Rules of Appellate Procedure to render the judgment the trial court should have rendered. *See* Tex. R. App. P. 43.2. Because the record does not support the award of fees, we modify the judgment by deleting the reimbursement fees award of $15,430.44. We affirm the trial court's judgment as modified.

AFFIRMED AS MODIFIED.

_____
LEANNE JOHNSON
Justice

Submitted on April 28, 2022
Opinion Delivered June 8, 2022
Do Not Publish

Before Golemon, C.J., Horton and Johnson, JJ.

22